O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| TARON GORGOYAN, <br><br> Plaintiff, <br><br> v. <br><br> NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] <br><br> Defendant. | Case No. CV 16-04668-DFM <br><br> MEMORANDUM OPINION AND ORDER |

Taron Gorgoyan ("Plaintiff") appeals from the Social Security Commissioner's final decision denying his applications for Supplemental Security Income and disability insurance benefits. For the reasons discussed below, the Commissioner's decision is affirmed and this matter is dismissed with prejudice.

///

///

---

[1] On January 23, 2017, Berryhill became the Acting Social Security Commissioner. Thus, she is automatically substituted as defendant under Federal Rule of Civil Procedure 25(d).

# I.
# BACKGROUND

Plaintiff filed applications for Supplemental Security Income and disability insurance benefits in March 2012, alleging disability beginning on May 15, 2002. See Administrative Record ("AR") 178-88. After his applications were denied, he requested a hearing before an administrative law judge ("ALJ"). See AR 111-17. At a March 2014 hearing, the ALJ heard testimony by a vocational expert ("VE") and Plaintiff, who was represented by counsel. See AR 44-76.

In April 2014, the ALJ denied Plaintiff's claims. See AR 20-38. The ALJ concluded that Plaintiff was ineligible for disability insurance benefits because his earnings record only entitled him to benefits through March 31, 2002. See AR 23. Turning to Plaintiff's Supplemental Security Income application, the ALJ found that Plaintiff had medically-determinable severe impairments of history of gunshot wound to the left side of face from 2002, status post major facial surgery, and resulting left eye blindness; status post motor vehicle accident with internal derangement of the left knee; status post motor vehicle accident with cervical and lumbar spine strain; and mood disorder. See AR 26-27. He found that despite those impairments, Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations: he could sit, stand, and walk for six hours in an eight-hour workday, occasionally performing postural activities; he had no distance or depth perception, a limited field of vision, and no binocular vision due to left eye blindness; he could not work in a setting requiring a good speaking ability or communicate with others on a regular basis; he must avoid exposure to hazards; and he could perform simple, routine, repetitive tasks. See AR 29-35.

Based on the VE's testimony, the ALJ found that given Plaintiff's age, education, work experience, and RFC, Plaintiff would be able to work as an

apparel checker, bench assembler, or routing clerk. See AR 37. Because these jobs existed in significant numbers in the national economy, the ALJ found that Plaintiff was not disabled. See AR 37-38.

The Appeals Council denied review of the ALJ's decision, which became the final decision of the Commissioner. See AR 5-8; see also 20 C.F.R. §§ 404.981, 416.1481. Plaintiff sought judicial review in this Court. See Dkt. 1.

## II.
## DISCUSSION

Plaintiff argues that the ALJ (1) failed to properly evaluate Plaintiff's symptom testimony; (2) failed to give proper weight to treating physicians and relied too heavily on non-treating, non-examining physicians; (3) failed to explicitly consider whether Plaintiff met three listings; (4) had insufficient evidence to conclude that Plaintiff could perform jobs that exist in significant numbers in the national economy; and (5) failed to develop the record on the onset date of Plaintiff's mental impairment. See Joint Stipulation ("JS") at 4.

### A. **Plaintiff's Symptom Testimony**

#### 1. **Applicable Law**

The court engages in a two-step analysis to review the ALJ's evaluation of Plaintiff's symptom testimony. See Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. Id. If the claimant satisfies this first step, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of symptoms only by offering specific, clear and convincing reasons for doing so. Id.

In March 2016, the Social Security Administration issued Social Security Ruling ("SSR") 16-3p and eliminated the term "credibility" from the agency's policy. As the SSR explains:

3

> In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities . . . .

SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017).

Plaintiff argues that SSR 16-3p is a clarification of policy, not a new policy, making retroactive application appropriate. See JS at 5-6. The Social Security Administration recently revised SSR 16-3p to clarify that the agency expects federal courts to review the Commissioner's decisions using the rules that were in effect at the time the decision was made. See SSR 16-3p, 2017 WL 4180304, at *13 n.27. Before that decision, some district courts in the Ninth Circuit applied SSR 16-3p retroactively. See, e.g., Rigole v. Berryhill, No. 15-02072, 2017 WL 4839075, at *9 (D. Or. Oct. 26, 2017) ("SSR 16-3p is a clarification of sub-regulatory policy rather than a new policy and thus is appropriately applied retroactively."). Others did not. See, e.g., Wright v. Colvin, No. 15-02495, 2017 WL 697542, at *9 (N.D. Cal. Feb. 22, 2017) (concluding that SSR 16-3p does not apply retroactively). The Ninth Circuit recently suggested that SSR 16-3p is consistent with existing Ninth Circuit case law. See Trevizo, 871 F.3d at 678 n.5 (noting that SSR 16-3p "makes clear what our precedent already required"—that the ALJ is "not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness" but

4

rather to focus on "evaluat[ing] the intensity and persistence of [the alleged] symptoms").[2]

## 2. Analysis

Plaintiff brought a cane to the hearing and alleged that he was in constant, disabling pain from a 2002 self-inflicted gunshot to the face, resulting reconstructive surgeries, and knee and spinal injuries from a 2012 car accident. See AR 56-60, 64-67. He claimed that he was depressed and anxious "every day, every hour, every 30 minutes, every 20 minutes, every 3 hours." AR 66. He stated that people have a hard time understanding his speech because of his facial injuries. See AR 67-68.

The ALJ gave four reasons for discounting Plaintiff's allegations regarding the intensity, persistence, and limiting effects of his symptoms: (1) the objective evidence and the consultative examiners' findings did not support Plaintiff's allegations; (2) Plaintiff had a limited history of treatment for his impairments; (3) Plaintiff's activities of daily living were not consistent with the alleged degree of impairment; and (4) Plaintiff's criminal record showed a propensity for dishonesty. See AR 34-35. The ALJ also considered a report from Plaintiff's brother but concluded that it did not overcome the rest of the record. See AR 35.

    a.    Objective Evidence and Consultative Examiners' Findings

Plaintiff shot himself in the face in 2002, after shooting and killing his mother and shooting his brother (who survived) after his father's death of natural causes. See JS at 2; AR 734. Plaintiff underwent facial reconstructive

---

[2] Trevizo's statement about SSR 16-3p's consistency with existing precedent is hard to reconcile with numerous Ninth Circuit cases stating that ALJs may employ "ordinary techniques of credibility evaluation" when evaluating a claimant's symptom testimony. See, e.g., Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005).

surgery in 2002 and 2011. See AR 29, 696, 840. He lost his left eye in the shooting but, in May 2013, had 20/25 corrected vision in his right eye. See AR 30, 746-47. The RFC accounted for Plaintiff's limited vision. See AR 29.

Plaintiff was also in a car accident in November 2012. See AR 30, 1032. He complained afterward of neck, lower back, and left knee pain. Id. In an orthopedic consultation 11 days after the accident, he had spine tenderness and a reduced spinal range of motion but could walk on his toes, had normal reflexes, displayed normal alignment in his left knee, and, from his x-rays, showed normal spinal alignment and normal left knee alignment, with a possible calcified loose body. See AR 30, 1033-37. February 2013 MRIs revealed some spinal disc protrusion and possible chronic systemic bone disease with respect to his left knee. See AR 30, 1039-42. A June 2013 examination reflected back tenderness and reduced spinal range of motion, with the examiner recommending continued chiropractic care and "conservative treatment." AR 1029-31. A March 2014 examination reflected temporomandibular joint pain, spinal and neck pain, and bilateral knee tenderness. See AR 1111.

After a thorough review of Plaintiff's medical record, the ALJ concluded that the record did not support limitations greater that those he imposed in his RFC finding. See AR 30-31 ("[T]here is no evidence to suggest that the claimant would be unable to perform light exertional work."). This review included a review of the medical evidence after Plaintiff's 2012 accident. See AR 30. The ALJ noted that the record reflected no surgical intervention other than Plaintiff's left knee surgery, no pain relief injections, no nerve root impingement in Plaintiff's back, and no evidence of significant deterioration in Plaintiff's knee. See AR 30-31. The ALJ thus concluded that the "objective evidence does not support the claimant's allegations." AR 34. Substantial evidence supported the ALJ's conclusion that Plaintiff was capable of light

exertional work, which—with the ALJ's additional RFC limitations—involved being able to do substantially all of: lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds; walking or standing six hours out of eight, or sitting most of the time with some pushing and pulling of arm or leg controls; and occasional postural activities. See 20 C.F.R. § 416.967.

      Plaintiff argues that the ALJ "improperly relied on the August 2012 [consulting examiner] and September 2012 State Agency consultants." JS at 18. But the record shows that the ALJ only gave the opinions of these consultants partial weight, and further noted that their opinions did not include exertional limitations "warranted by the record." AR 31. The earlier of the two is an opinion by Dr. Helen Rostamloo, who opined that Plaintiff had no exertional limitations, despite having left-eye blindness. See AR 659-63. But the ALJ only gave Dr. Rostamloo's opinion some weight, noting that the opinion "acknowledges the claimant's visual limitations." AR 31. Otherwise, the ALJ noted that the Plaintiff's record "as a whole is more consistent with limiting the claimant to light exertional work, rather than finding that the claimant has no exertional limitations." Id. Likewise, the ALJ gave similar treatment to the September 2012 medical consultant's opinion by noting that the "visual and speaking limitations" reported by the medical consultant "are consistent with the record as a whole" but adding that the medical consultant did not include any exertional limitations "as warranted by the record." Id.

      Plaintiff claims that he has "tremendous difficulty speaking" and "profound psychiatric problems." JS at 8. But the ALJ adequately accounted for Plaintiff's speaking difficulties in the RFC. See AR 29. Moreover, it is apparent from the hearing transcript that Plaintiff could make himself understood when necessary. See AR 51-68 (engaging in lengthy question and answer session with ALJ, albeit with ALJ asking Plaintiff to repeat answers

occasionally, with court reporter able to transcribe most of conversation).

As for Plaintiff's psychiatric problems, the ALJ noted that no physician or psychologist supported Plaintiff's claims and that the examining and reviewing doctors' findings were not consistent with Plaintiff's complaints. See AR 34-35. For example, consultative examiner Nina Kapitanski, M.D., opined in August 2012 that Plaintiff had full cooperation, fair eye contact, normal psychomotor activity, a linear and goal-directed thought process, no hallucinations or delusions, no obsessions, compulsions, or paranoia, no suicidal or homicidal ideation, full alertness and orientation, good memory, and exhibited the ability to concentrate (including performing serial sevens), think abstractly, and exercise good judgment.[3] See AR 32, 666-67.

In sum, the ALJ's finding that the record lacked objective medical evidence to support the alleged severity of Plaintiff's symptom testimony is supported by substantial evidence and is a proper basis for discounting Plaintiff's symptom testimony. See Burch, 400 F.3d at 681 ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis.").

///

---

[3] Plaintiff claims that Dr. Kapitanski "lacks the subject matter expertise in psychiatry." JS at 8. Plaintiff's support for this argument is Dr. Kapitanski's statement that she was a "board eligible" psychiatrist (rather than "board certified") at the time of her opinion. See id.; see also AR 668. Plaintiff cites Daubert v. Merrell Dow Pharms, Inc., 509 U.S. 579 (1993), to support this argument. See JS at 8. But Daubert and Federal Rule of Evidence 702 do not govern the admissibility of evidence before an ALJ in a Social Security disability case. See Bayliss v. Barnhart, 427 F.3d 1211, 1218 n.4 (9th Cir. 2005). As an M.D. who specialized in psychiatry at the time of her opinion, Dr. Kapitanski was qualified to opine to the Social Security Administration on Plaintiff's psychiatric condition. See 20 C.F.R. § 416.902(a) ("Acceptable medical source means a medical source who is a . . . [l]icensed physican (medical or osteopathic doctor)").

b. Conservative Treatment

The ALJ also cited Plaintiff's history of limited treatment, which belied his subjective complaints. See AR 34-35. The ALJ noted: (1) the lack of a prescription for Plaintiff's cane and that he "rose easily and walked quickly out of the hearing room while putting no weight on the cane"[4] (AR 34); (2) that Plaintiff never underwent surgery or pain injections for his spine or knee (see id.); (3) that Plaintiff had no history of admission to a psychiatric unit or receipt of any psychotherapy treatment or mental health care, including outpatient services, counseling, or therapy (see id.); (4) that in numerous consultations in 2012 and 2013, Plaintiff discussed only reconstructive surgery options and mandible pain (see AR 34, 691-711, 1059, 1065, 1087, 1103); (5) that Plaintiff was prescribed medication and physical therapy following other exams between 2012 and 2014 without any further course of treatment (see AR 34-35, 653-58, 741-47, 1031, 1038, 1107-12); and (6) that the only mental health treatments in the record were three dates in 2012, when the "claimant had cursory meetings with social workers, as a parolee" (AR 35, 728-35). All of these reasons are supported by substantial evidence in the record and are clear and convincing reasons to discount Plaintiff's symptom testimony. See Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (holding that ALJ may infer that claimant's "response to conservative treatment undermines [claimant's] reports"); see also Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989) (finding that the claimant's allegations of persistent, severe pain and discomfort were belied by "minimal conservative treatment").

Plaintiff argues that the ALJ should have "follow[ed] up" on whether

---

[4] Plaintiff suggests that the ALJ relied "on this reason alone" as the "sole basis" for discrediting Plaintiff's testimony. JS at 9. As explained herein, the ALJ had several reasons for discrediting the testimony.

9

Plaintiff's conservative treatment was due to his finances and loss of Medicaid, because Plaintiff testified about "financial impediments in relation to his need for knee surgery." JS at 9. But at no point in the hearing transcript does Plaintiff complain of financial impediments to obtaining knee surgery. Rather, he testified that the only doctor qualified to perform reconstructive surgery on his jaw accepted only Medicare, which Plaintiff did not have. See AR 60. Furthermore, the record does not reflect that Plaintiff ever inquired about the possibility and cost of more aggressive treatment, which one would expect given the severity of his subjective complaints.

          c.      Activities of Daily Living

Plaintiff reported that he "goes for walks" and could adequately perform self-care activities including dressing, bathing, eating, toileting, and taking safety precautions. See AR 665-66. The ALJ noted that these reports "suggest that he has a better physical and mental capacity than he has stated in the record." AR 35. While it is true that "[o]ne does not need to be 'utterly incapacitated' in order to be disabled," Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) (quoting Fair, 885 F.2d at 603), the extent of Plaintiff's activities support the ALJ's finding that his reports of the severity of his impairments were not fully credible. See Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (holding that ALJ may weigh inconsistencies between claimant's testimony and daily activities); Curry v. Sullivan, 925 F.2d 1127, 1130 (9th Cir. 1991) (finding that the claimant's ability to "take care of her personal needs, prepare easy meals, do light housework, and shop for some groceries[] . . . may be seen as inconsistent with the presence of a condition which would preclude all work activity").

          d.      Criminal Record and SSR 16-3p

The ALJ also took into account Plaintiff's "criminal record showing a propensity for dishonesty." AR 35. As noted above, under the SSA's new

regime for evaluating symptom testimony, SSR 16-3p, taking Plaintiff's criminal history into account would be improper. But even if the Court assumes that SSR 16-3p applies retroactively and the ALJ should not have taken Plaintiff's criminal history into account, any error would be harmless. The ALJ gave other clear and convincing reasons supported by substantial evidence for rejecting Plaintiff's testimony. See Carmickle v. Comm'r, 533 F.3d 1155, 1162 (9th Cir. 2008) (holding that so long as remaining reasons and ultimate credibility determination are adequately supported by substantial evidence, any error affecting one of several reasons can be harmless).

e. Brother's Corroboration

In attacking the ALJ's evaluation of Plaintiff's symptom testimony, Plaintiff cites his brother's report. See JS at 10. In that June 2012 report, Plaintiff's brother wrote "unable to concentrate, pain, vision problem" and then "same" for Plaintiff's ability to dress, bathe, shave, eat, use the toilet, and "other." AR 221. He wrote that Plaintiff could not do chores, pay bills, or count change. AR 222-24. In "remarks," Plaintiff's brother wrote, "disabled person is constantly in medical and mental pain." AR 227.

An ALJ must consider all of the available evidence in the individual's case record, including written statements from caregivers and siblings. See SSR 06-03P, 2006 WL 2329939 (Aug. 9, 2006); Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052-54 (9th Cir. 2006). The ALJ may discount that testimony, however, by providing "reasons that are germane to each witness." Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993).

The ALJ concluded that Plaintiff's brother's report: (1) offered little insight on Plaintiff's functional abilities, but simply indicated repeatedly and "without elaboration" that Plaintiff was "unable to concentrate, regardless of the activity addressed"; and (2) was of questionable accuracy, given that he reported that Plaintiff had problems dressing and could not count change, but

11

elsewhere Plaintiff acknowledged that he could perform these activities. See AR 35, 241-48, 666. These were appropriate and germane reasons to discount Plaintiff's brother's claims.

During the hearing, Plaintiff stated that his brother had driven him to the hearing and "was willing to come in and take – come in and – I don't know why they didn't let him." AR 65. Plaintiff argues that the ALJ therefore improperly criticized Plaintiff for failing to call his brother to testify, "preventing cross-examination of his allegations." AR 35; see also JS at 10. Plaintiff was represented by counsel at the hearing. Plaintiff and his counsel, not the ALJ, had control over Plaintiff's brother. There was nothing improper about the ALJ noting that Plaintiff's brother was not present at the hearing to be cross-examined. Furthermore, even if this was error, it was harmless; the ALJ gave additional germane reasons for disregarding the brother's claims.

**B.  Treating Physicians**

**1.  Applicable Law**

Three types of physicians may offer opinions in Social Security cases: those who treated the plaintiff, those who examined but did not treat the plaintiff, and those who did neither. See 20 C.F.R. § 416.927(c); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995) (as amended Apr. 9, 1996).[5] The weight accorded to each physician's opinion depends on several factors,

---

[5] Social Security Regulations regarding the evaluation of opinion evidence were amended effective March 27, 2017. Where, as here, the ALJ's decision is the final decision of the Commissioner, the reviewing court generally applies the law in effect at the time of the ALJ's decision. See Lowry v. Astrue, 474 F. App'x 801, 805 n.2 (2d Cir. 2012) (applying version of regulation in effect at time of ALJ's decision despite subsequent amendment); Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir. 2004) ("We apply the rules that were in effect at the time the Commissioner's decision became final.").

12

including whether the opinion is consistent with the record and accompanied by adequate explanation, the nature and extent of the treatment relationship, and the degree to which it provides supporting explanations that consider all pertinent evidence in a Plaintiff's claim. See 20 C.F.R. § 416.927(c). A treating physician's opinion is generally entitled to more weight than an examining physician's opinion, which is generally entitled to more weight than a non-examining physician's. Lester, 81 F.3d at 830.

An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. Id. A contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons that are supported by substantial evidence. Id. "Where the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

### 2. Analysis

Plaintiff argues that the ALJ erred by (1) giving the June 2013 opinion by treating physician Hakop Oganyan, M.D., little weight; and (2) failing to "properly acknowledge diagnoses and prognoses made by his other treating physicians."[6] JS at 19.

    a.    Dr. Oganyan

In June 2013, Dr. Oganyan at All for Health Community Clinic in Glendale, California, completed a physical residual functional capacity

---

[6] Plaintiff also mentions the May 2008 opinion by treating physician Lindy Dugan, M.D., but offers no analysis or argument. See JS at 19.

13

questionnaire on Plaintiff's behalf. Dr. Oganyan, who had been treating Plaintiff since 2011, opined that Plaintiff was incapable of even "low stress" work because of his post-traumatic stress disorder, could not sit for more than 10 minutes at a time, could not stand for more than 15 minutes at a time, could walk, stand, and sit for less than 2 hours out of 8, could rarely lift less than 10 pounds, and had severe limitations in repetitive reaching, handling, and fingering. AR 738-40.

The ALJ gave specific and legitimate reasons for rejecting Dr. Oganyan's report. See AR 31. Dr. Rostamloo's independent examination strongly contradicted Dr. Oganyan's report; Dr. Oganyan opined that Plaintiff was essentially incapacitated, whereas Dr. Rostamloo recommended no exertional limitations. Plaintiff argues that the ALJ should have obtained an updated consultative examination, because Dr. Rostamloo's report was made before Plaintiff's November 2012 car accident. See JS at 25. As the ALJ noted, examinations following the car accident showed normal reflexes, normal alignment in Plaintiff's left knee, and normal spinal alignment and normal left knee alignment. There is no indication that an updated consultative report was required. It was "solely the province of the ALJ" to resolve this conflict. Andrews, 53 F.3d at 1041. Furthermore, as the ALJ pointed out, Dr. Oganyan's report was inconsistent with the objective medical evidence. It was apparent, therefore, that Dr. Oganyan's opinion was based on Plaintiff's subjective complaints, which the ALJ properly discounted. Dr. Oganyan included no diagnostic or objective evidence to support his assessment of Plaintiff's abilities. In short, the ALJ did not err in giving little weight to Dr. Oganyan's opinion.

        b.     "Other Treating Physicians"

In the Joint Stipulation, Plaintiff references a number of treatment records dated between 2002 and 2010 (while he was imprisoned) showing that

at various times, he reported feeling overwhelmed, depressed, suicidal, and paranoid. See JS at 19-20. Plaintiff also cites post-incarceration treatment records showing diagnoses of post-traumatic stress disorder and depression. See JS at 20-21. None of these records suggest that these ailments were disabling, except for the June 2013 form by Dr. Oganyan that the ALJ properly discounted (as explained above).

Plaintiff criticizes the ALJ for "misstating" Dr. Kapitanski's report. JS at 21-22. Dr. Kapitanski concluded, among other things, that Plaintiff had moderate difficulty maintaining social functioning. See AR 667. The ALJ disagreed with this assessment, based on Plaintiff's "ability to interact with others at the hearing and with Dr. Kapitanski during her examination," but otherwise gave Dr. Kaptanski's opinion some weight—such as her opinion that Plaintiff had full cooperation, fair eye contact, normal psychomotor activity, a linear and goal-directed thought process, no hallucinations or delusions, no obsessions, compulsions, or paranoia, no suicidal ideation, full alertness and orientation, and good memory. AR 32, 664-67. Plaintiff does not adequately explain how the ALJ misstated Dr. Kapitanski's report.[7]

Plaintiff also argues that the ALJ improperly characterized treatment notes in June 2013 and March 2014—which describe Plaintiff as having "confused orientation, a severely impaired remote memory, a constricted affect, obsessive thoughts, paranoia, poor insight, poor judgment, and poor attention span and concentration"—as unreliable and "regurgitated." JS at 22; AR 32, 744-45, 1111. The ALJ did note that the treatment notes were suspiciously similar despite being eight months apart, but "nonetheless"

---

[7] Plaintiff asks the Court to take judicial notice of a news article reporting that Plaintiff was incarcerated in September 2013 for hitting a neighbor with a metal object. See JS at 22. The Court takes judicial notice of the existence of this article, although it has no bearing on the outcome of this case.

15

limited Plaintiff to simple, routine, repetitive work. AR 33.

Turning to Plaintiff's facial injuries, Plaintiff argues that the ALJ did not sufficiently credit Plaintiff's potential right eye retinal detachment. See JS at 23. Plaintiff does not allege that his retina is in fact detached and does not cite to anything in the record that supports a different RFC.

## C.  Listings 2.09, 12.03, and 12.06

Plaintiff complains that the ALJ erred in failing to consider whether Plaintiff met Listings 2.09 (loss of speech), 12.03 (psychotic disorders), and 12.06 (anxiety related orders). See JS at 33-35, 39. While Plaintiff believes that he meets these listings, his argument is that the ALJ's mere failure to consider these listings warrants remand. See id. at 39.

The ALJ did not err by failing to list every listing that the ALJ considered. The ALJ stated that he found that Plaintiff "has no listing-level impairments" and that he "specifically considered sections of Appendix 1." AR 27. This statement, supported by substantial evidence, was sufficient. See Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990) (holding that requiring ALJ to state why claimant failed to satisfy every different section of listing of impairments would "unduly burden the social security disability process").

Even if the ALJ had a duty to state explicitly that he had considered these three listings, any error was harmless. Plaintiff bore the burden of demonstrating that he met these listings. See Sullivan v. Zebley, 493 U.S. 521, 531 (1990). He did not meet that burden.

With respect to Listing 2.09, Plaintiff did not show an "inability to produce by any means speech that can be heard, understood, or sustained." 20 C.F.R. § 404, Subpart P, App. 1, § 2.09; see also 20 C.F.R. § 416.925 (incorporating by reference the Listing of Impairments in 20 C.F.R. § 404, Subpart P, Appendix 1). Listing 12.03 has three parts, and a claimant must

meet Parts A and B or Part C. 20 C.F.R. § 404, Subpart P, App. 1, § 12.03. Plaintiff has not shown "medically documented persistence" of delusions or hallucinations, catatonia, incoherence, or emotional withdrawal or isolation (Part A) or a "medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities" (Part C). Last, Listing 12.06 has three parts, and a claimant must meet parts A and B or parts A and C. Id. § 12.06. Plaintiff has not shown any marked restriction of activities of daily living, marked difficulties in maintaining social functioning or concentration, persistence, or pace; or repeated episodes of decompensation of extended duration (Part B). Nor has Plaintiff has shown a "complete inability to function independently outside the area of one's home" (Part C).

## D. Plaintiff's Ability to Work

In his fourth argument, Plaintiff purports to attack the ALJ's hypotheticals to the VE. See JS at 40-41. In fact, Plaintiff's argument is that the ALJ's RFC should have included additional limitations: use of a cane, a knee injury, needing to take more than four breaks in a two hour period, speech problems, vision problems, and medication side effects. See JS at 40-43. As explained above, the RFC adequately reflected Plaintiff's speech and vision problems. As also explained above, the ALJ gave clear and convincing reasons for discounting Plaintiff's testimony on the cane and other symptoms. Thus, the ALJ did not need to address these matters in hypotheticals to the VE. See Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) ("While the record contains conclusory statements that Ms. Thomas needed a cane, the only objective medical evidence of a required assistive device was a wrist splint prescribed for her carpal tunnel syndrome. Without objective medical evidence that Ms. Thomas needed a cane or wheelchair, and in light of the ALJ's

findings with respect to Ms. Thomas' lack of credibility, there was no reason to include Ms. Thomas' subjective use of those devices in the hypothetical to the VE.").

Plaintiff also points out that, despite Plaintiff's lack of depth perception, the occupation of bench assembler requires frequent depth perception, according to the Dictionary of Occupational Titles ("DOT").[8] See JS at 40-41; see also DOT 706.684-022. Where a VE's testimony conflicts with the DOT, the ALJ must determine whether the VE's explanation for the conflict is reasonable and whether a basis exists to rely on the expert rather than on the DOT. See Massachi v. Astrue, 486 F.3d 1149, 1153 (9th Cir. 2007). Here, the ALJ did not elicit an explanation for the conflict from the VE. See AR 72. However, this error was harmless. The VE also found that Plaintiff could work as an apparel checker or routing clerk; neither of these occupations requires depth perception. See DOT 299.667-014, 222.687-022; 20 C.F.R. § 416.966(b) ("Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications." (emphasis added)); see also Carroll v. Colvin, No. 12-1181, 2013 WL 1935250, at *1 (C.D. Cal. May 8, 2013) (finding alleged conflict with DOT harmless where VE also correctly testified that claimant could work as a ticket taker/usher).

E. **Onset Date for Mental Impairments**

Plaintiff argues that the ALJ had a duty to develop the record on the onset date of Plaintiff's mental impairments, because Plaintiff did not "[wake]

---

[8] The Social Security Administration has taken administrative notice of the DOT, which is published by the Department of Labor and gives detailed physical requirements for a variety of jobs. See 20 C.F.R. § 416.966(d)(1).

18

up one morning and suddenly decide[] to gather his bereaved family together in the afterlife by killing them all and then committing suicide, without the predicate of a significant mental impairment." JS at 44-45.

According to SSR 83-20 ("Titles II and XVI: Onset of Disability"), the "starting point in determining the date of onset of disability is the individual's statement as to when disability began." "The day the impairment caused the individual to stop work is frequently of great significance in selecting the proper onset date." Id. Medical evidence is also helpful, where available, including "post-onset date" medical evidence that assists the ALJ in inferring a past onset date. Id.

Given the guidelines in SSR 83-20 and the evidence before him, the ALJ did not err in determining Plaintiff's onset date. In his applications, Plaintiff alleged an onset date of May 15, 2002. See AR 178-88. At the hearing (where he was represented by counsel), Plaintiff did not correct this date but rather continued to allege that his disability began at the time of the shooting. See AR 55. Plaintiff worked at a family restaurant between 2000 and 2002, working eight hours a day, five days a week; his testimony at the hearing suggests that he continued working in this job until around the date of the shooting.[9] See AR 51-52, 55, 233, 253. He also stated in a disability report that he stopped working on May 15, 2002. See AR 232. The record does not include any medical evidence before 2004, and Plaintiff cites to no medical evidence past 2004 that would support an onset date earlier than May 2002. In short, nothing in the record made the onset date unclear, meaning the ALJ had no duty to inquire further.

///

---

[9] Plaintiff states in the Joint Stipulation that his father died in February 2002 and Plaintiff "continued to attempt to manage [the restaurant] after his father died." JS at 2, 17.

19

# III.
# CONCLUSION

For the reasons stated above, the decision of the Social Security Commissioner is AFFIRMED and the action is DISMISSED with prejudice.

Dated: November 28, 2017

_____
DOUGLAS F. McCORMICK
United States Magistrate Judge